STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. SAL-VATORE LOPONIO, PLAINTIFF IN ERROR.

Argued June 17, 1913—Decided November 17, 1913.

Where legal advice of any kind is sought from a duly accredited professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself, or by the legal advisor or by the agent of either confidentially used to transmit the communication, except the client waives the protection.

---

On error to the Essex County Oyer and Terminer.

Loponio was indicted and convicted of murder in the first degree for shooting and killing a police officer, McGovern, at about ten P. M., on the streets of Newark. No one witnessed the shooting, and, apart from the letter next hereinafter mentioned, the evidence produced at the trial of Loponio was entirely circumstantial and quite short of convincing. A witness, Rochefort, however, who was a fellow-prisoner with Loponio while the latter was awaiting trial, testified, over objection, that he acted as the scrivener of the tier where Loponio's cell was, and that as such, he wrote a letter at Loponio's dictation and request to a lawyer, D'Aloia, to engage him for Loponio's defence. The letter which was entirely in Rochefort's handwriting and signed by him in Loponio's name is, if real, manifestly a communication from a client to an attorney-at-law for the purpose of employing and instructing him in his professional capacity. Rochefort testified Loponio said that that was his purpose in dictating it. Loponio could not write in English. Whether he could speak English was a disputed question. The letter also contained a statement of the affair showing that Loponio did the killing but attempted to offer an excuse for it, which, if believed, would have reduced the degree of the crime. Counsel then objected that Rochefort could not testify to what Loponio dictated to him because it was a privileged communication and that the letter itself could not be admitted for the same reason. The court then afforded counsel an opportunity to offer further proof that the communication was privileged and Loponio himself was called, but denied positively that he ever dictated any letter to, or had any conversation with, Rochefort, or ever employed or contemplated employing D'Aloia as his lawyer. The prosecution then called D'Aloia, who testified that he had never been employed by or on behalf of Loponio, nor communicated with on his behalf. Another fellow-prisoner, Overton, awaiting trial for murder, testified that he was present in the cell with Loponio and Rochefort when the latter started to take the dictation and heard him say to Loponio: "You will have to tell me the truth; if you don't tell the truth it may get the lawyer mixed up," but

that then other prisoners came to the cell door and Rochefort said, "Get out of the light," and then he and the others went away, leaving Loponio and Rochefort alone. The learned trial judge found and ruled as follows:

"The court holds, as to the question of fact to be determined by it, that the defendant requested Rochefort, for the purpose of securing his services, to write a letter to Mr. D'Aloia, who is duly admitted and licensed to practice as an attorney and counsellor-at-law of New Jersey, to procure his services, as indicated in the letter; that Rochefort acted as the amanuensis in writing the letter; that it, in part at least, appears on its face to seek advice from a professional legal advisor in his capacity as such, and that the contents of the letter, in part at least, are relevant to that purpose; that the letter was written as a confidence, except in so far as the presence of Overton was permitted by the defendant; that it was placed in an envelope and addressed to Mr. D'Aloia and sealed, and that, subsequently, a day or two afterwards, or perhaps three or four days, the defendant gave the letter to Mr. Rochefort and told him that he desired to make some changes in it; that Rochefort at that time did not say he would make the changes, but, on the contrary, kept the letter and retained it without the consent of the defendant, and against the defendant's protest; that the letter was never delivered to D'Aloia, but came into the possession of Mr. Walter Godfrey, the detective sergeant connected with the prosecutor's office, as stated by Rochefort. The rule of law is stated in *Wigm.*, § 2292, as follows: 'Where legal advice of any kind is sought from a professional legal advisor in his capacity as such, communications relevant to that purpose made in confidence by the client are at his instance permanently protected from disclosure by himself or by the legal advisor, except the client waives the protection.' The application of this principle of law to the facts stated by the court is doubtful, but it would seem, in view of the fact that the letter was never delivered to Mr. D'Aloia, that it is not a communication, and under section 505a of *Wharton on Evi-*

*dence,* in his latest edition, it would seem therefore that he is not protected by the privilege."

For the plaintiff in error, *Irving W. Teeple.*

For the defendant in error, *Louis Hood,* prosecutor of the pleas, and *Wilbur A. Mott,* assistant prosecutor.

The opinion of the court was delivered by

WHITE, J.   The necessary but fictitious assumption which charges everyone, in the conduct of his own actions and affairs, with a knowledge of the law even more complete than that in fact possessed by her ablest ministers, renders it equally necessary to an adequate administration of justice, that her officers, appointed and accredited for that purpose, shall be *available* for confidential consultation in order that they may supply, to the extent of their learning and ability, the actual deficiency in a suitor's presumed knowledge of the law, *as if they were that suitor's other self.* They would not be thus "available" if the confidences reposed in them might be betrayed either by them, or by the agents of either confidentially employed to communicate such confidences.

Where, therefore (enlarging somewhat upon the language of Professor Wigmore), legal advice of any kind is sought from a duly-accredited professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself, or by the legal advisor, or by the agent of either confidentially used to transmit the communications, except the client waives the protection.   *Wigm. Ev.,* § 2292; *Hatton* v. *Robinson,* 31 *Mass.* 416.

A third party who secretly overhears a verbal confidential communication (containing damaging admissions) from a client to his attorney, however, may testify thereto, because he does not come within the privileged confidential relationship.   *Pulford's Appeal,* 48 *Conn.* 247; *Hoy* v. *Morris,* 13 *Gray (Mass.)* 519.   It is true that he was never intended to

hear what he did hear, but that is no bar to his testimony. If witnesses were only permitted to testify to what accused persons had intended they should see or hear, most crimes would go unpunished. The same reasoning would seem to apply to a written confidential communication from a client to his attorney which falls into the hands of a third party without treachery on the part either of the attorney or of a confidential agent employed to transmit it. Of course, in a sense, a letter to the attorney is in itself a confidential means of communication and might be considered as carrying its privilege with it into whatever hands it should fall from whatsoever cause. But so is a verbal communication confidential and should equally be entitled to carry with it its own protection. This the latter does not do, however, where accidentally or surreptitiously overheard by a third party, and it is impossible to draw a logical line of distinction between such an overheard verbal communication and a confidential letter falling into a third party's hands. Both are facts, and the rule applicable to both would seem to be that both may be proved if they can be proved without calling upon anyone whose lips are sealed or whose hands are tied. *State* v. *Mathers,* 64 *Vt.* 101.

As to whose hands are so tied where the writing appears in the possession of a third party to whom it has been entrusted for delivery by the client, is, under the authorities, a question of some uncertainty. In *Bunbury* v. *Bunbury, 2 Beav.* 173, it was said: "The necessity which arises of transmitting such communication through another party, renders it privileged," seeming to indicate that there must be a necessity for adopting a means of indirect communication in order to justify the extension to it of the extraordinary privilege, but in *Reid* v. *Langlois,* 1 *Mac. & G.* 627, Lord Cottenham thought that was not what the Bunbury case decided, and that there was no good reason, and, as he believed, no good authority for the rule.

However this may be, certainly a client who adopts the indirect instead of the direct method without good reason or reasonable necessity for so doing comes perilously near the

one who makes his verbal communication to his attorney in the presence of a third person. In that case the verbal communication is not privileged because it is presumed that it was not intended to be confidential, otherwise it would not have been communicated in the presence of one in whose mouth it would not be privileged. *People* v. *Buchanan,* 145 *N. Y.* 1. The question probably comes down after all to one of whether or not the method employed was intended and understood to be confidential, and in deciding that question, the presence or absence of reasonable necessity would doubtless be an important element.

Clearly, therefore, where the client has used a confidential agent of transmission, which, under the circumstances it was reasonably necessary for him to do, he will be protected against a betrayal of this confidence by such agent to the same extent as against a betrayal of confidence by his attorney.

Thus, in *DuBarre* v. *Livette,* 11 *Peake* 108, conversation had through an interpreter with the attorney, the client being a Frenchman, and the attorney not understanding French, was held to be privileged, and the interpreter was not permitted to testify to it against the objection of the client. While this decision (rendered in 1791) occurred in the twilight zone, during which the basis of the doctrine of privileged communications underwent a transformation from the *preservation of the honor of the attorney* to the *recognition of a right of the client,* and seemingly was rested upon the former by its author, Lord Chief Justice Kenyon, who said a year later, in *Wilson* v. *Rastall,* 4 *T. R.* 753 : "In Madame DuBarre's case I said at the trial that the interpreter was the organ of the attorney," it is nevertheless in complete accord with the modern view, into which it has been incorporated by modern text-writers and decisions. See *Wigm. Ev.,* § 2317, and cases there cited; 23 *Am. & Eng. Encycl. L.* (*2d ed.*) 66, and cases there cited.

In *Anderson* v. *Bank, L. R.,* 2 *Ch. Div.* 644, Jessel, M. R., speaking of the necessary confidential means a client may employ of communicating with his attorney within the privi-

lege, said: "He may employ a third person to write the letter, or he may send the letter through a messenger, or he may give a verbal message to a messenger."

In the case at bar, the letter in question was not in Loponio's handwriting, nor was it signed by him. Standing alone it was without evidential value, nor was it possible to give it such value without the testimony of Rochefort to the communication received by him from Loponio. This communication he received while acting as Loponio's amanuensis in writing a letter to employ a lawyer for the latter's defence. Loponio, who is a foreigner and cannot write English, was in jail here charged with murder. The employment of the amanuensis was reasonably necessary. Rochefort was not only a fellow-prisoner, but was the "scrivener of the tier" where both their cells were located. He wrote letters for the prisoners when they desired him to do so. He advised with Loponio as to the selection of a lawyer. The letter itself breathes throughout its confidential nature. In one place it tells the attorney, "No one will read this letter but you, for I will seal it." The sealing would be of little avail if the amanuensis might be permitted to disclose its contents. Clearly, from every viewpoint, Rochefort's employment was confidential for the purpose of effecting a communication from Loponio to his intended lawyer to engage and instruct him. We think Rochefort should not have been permitted to testify in violation of this confidence.

It is immaterial that the lawyer had not been previously employed. A letter for the purpose of employing, and intended to employ and instruct an attorney, is protected to the same extent as one of instruction after the employment had taken place, and this, although the lawyer subsequently refuse the employment. But there must be an intention to employ. 10 *Encycl. Ev.* 256, and cases there cited.

It is said that the communication was not confidential because of the presence of Overton when the dictation began. This is sufficiently answered by the fact that he was not present when the dictation reached the point where the confidential part of the letter commenced. He may have been

sent out of the cell for the very purpose of preventing his hearing this confidential part.

The learned trial judge seemed also to be influenced in his ruling by Loponio's denial of ever having had any intention of employing the lawyer to whom the letter was addressed, and the denial of that lawyer of ever having been so employed. The thought apparently was that as the privilege could only extend to a communication to the client's lawyer, this communication was, on the showing of both the client and the lawyer, not privileged, because the lawyer was never so employed, nor attempted to be employed. But Loponio also denied dictating the letter. His denials may both have been true, or they may both have been false, but certainly one was not true and the other false. If he did dictate the letter, he certainly attempted to employ the attorney; that is what the letter itself purported to do. The fact, therefore, that Loponio says he did not dictate the letter to employ D'Aloia can furnish no justification for permitting Rochefort to violate his confidence by testifying that Loponio did dictate it. If we accept as true Rochefort's testimony that Loponio did dictate the letter, Rochefort's lips are sealed.

The judgment is reversed and a *venire de novo* awarded.

*For affirmance*—None.

*For reversal*—The Chief Justice, Garrison, Swayze, Trenchard, Parker, Voorhees, Minturn, Kalisch, Vredenburgh, Congdon, White, Terhune, Heppenheimer, JJ.  13.