**WILLARD C. BEACH AIR BRUSH CO.**

v.

**GENERAL MOTORS CORP. et al.**

Civ. No. 1093.

United States District Court, D. New Jersey.

Dec. 22, 1953.

See also D.C.N.J., 99 F.Supp. 951.

Harry D. Gross, Newark, N. J., Harold G. Aron, Alexander Chananau, New York City, for plaintiff.

Carpenter, Gilmour & Dwyer and James D. Carpenter, Jersey City, N. J., Drury W. Cooper, New York City, for defendants.

HARTSHORNE, District Judge.

The present hearing in the above cause was strictly limited, in accordance with the decision of the United States Court of Appeals for the Third Circuit,[1] to the issue as to whether or not there has been a valid "accord and satisfaction" between the parties to the litigation on the complaint filed herein. "That the plaintiff has in fact entered into a valid and binding agreement for the settlement and discontinuance of this suit" and has in fact settled it, is clear from the evidence. We turn to the facts.

Willard C. Beach claimed to be the inventor of a valuable process. He was also the President of the plaintiff company and the owner of 998 out of its 1,000 shares of stock, his wife owning 1, and the stenographer of his attorney Brown, the other, of the 2 remaining shares. Unfortunately, he was a victim of hypoglycemia, a disease with recurrent attacks. His company sued defendant company and certain of its officers and employees herein, claiming they were using this process, which he had assigned to his company, without right. The case came on to be tried in November 1947. Beach had been put on the

1. Willard C. Beach Air Brush Co. v. General Motors Corp., 3 Cir., 1950, 184 F. 2d 569, 570. See also Id., D.C.N.J. 1950, 88 F.Supp. 849.

stand, but after considerable examination and cross-examination, could not return to the stand the following day, due to his physical condition, whereupon the Court recessed till the next day. Since he could not appear then, the Court adjourned till the following day, but called a conference of counsel for both sides, and suggested the possibility of settlement. This was thereupon discussed at length between counsel, each agreeing to place a tentative proposal in that regard before their respective clients.

Accordingly, that afternoon Messrs. Brown and McGeehan, plaintiff's two attorneys, repaired to Beach's home, where they were met by his then wife, and found Beach sitting up in bed. Since plaintiff's counsel present the claim of privilege as to the communications in regard to settlement between Beach, who acted for his company in discussing settlement, and these attorneys, this Court does not consider the evidence conditionally received as to such communications. But this privilege extends only to the communications relating to such confidential legal advice, not to facts obvious to any observer, such as the general physical condition and actions of an individual, independent of such confidential communications, since the latter facts have nothing to do with the confidential relation of attorney and client. This also applies to the client's grant of authority to the attorney to settle, since this must be communicated to the other party to the settlement and is thus not confidential. This is made clear in many decisions, and is apparent from the general legal principle as stated by Wigmore and adopted in the State of New Jersey. (Under Fed.Rules Civ. Proc. rule 43(a), 28 U.S.C. evidence is admissible if permitted by *either* Federal law or the law of the state in which the Federal Court sits).

"Where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client (or to the client by the attorney), are at his (the client's) instance permanently protected from disclosure by himself or by the legal adviser, except the protection be waived." (Parentheses added by the Court) 8 Wigmore, Evidence, 3rd Ed., Sec. 2292.

Accord State v. Loponio, E. & A. 1913, 85 N.J.L. 357, 88 A. 1045, 49 L.R.A.,N.S., 1017; Trenton St. R. Co. v. Lawlor, E. & A. 1908, 74 N.J.Eq. 828, 71 A. 234; 74 A. 668.

Both attorneys say that, while in bed, Beach was mentally alert, joined in the conversation, discussed the matter intelligently, and signed the form of release which Mr. McGeehan had had prepared after the tentative conference in court. After the signing, Beach appeared in a jovial mood, reminisced with Mr. McGeehan about certain experiences at school, told jokes, and served the attorneys a drink, this all indicating that, while he was not able to be up and about, he was fully competent and understood what he was doing. And of course there was very good reason for Beach to want to settle. For this then illness, chronic in character, with recurrent attacks, made it quite likely that at any future trial of the General Motors matter he would no more be able to testify fully than at the recent trial. And obviously his testimony as the alleged inventor of the secret process, the basis of the suit, was crucial and would largely lose its effect on the jury if presented merely by deposition. Indeed, after signing the release, when McGeehan told Beach he would have to report the settlement to the Court the next morning, and wanted to be sure they both understood each other as to the settlement, Beach said " 'Mr. McGeehan, give me your hand' and he (Beach) took mine (McGeehan's) and put it in some unusual kind of handshake and said 'Mr. McGeehan, that is as good as a bond' ". The settlement was therefore reported to the Court the next morning, which accordingly declared a mis-trial.

The only testimony for plaintiff directly to the contrary is that given

by one Atwater, an old friend of Beach, who claims he entered Beach's home just as McGeehan and Brown were leaving it at the conclusion of the above conference. There is real question, as indicated below, whether Atwater's testimony should be considered at all. But, on the assumption that it should, as this portion at least does not bear on the matter of confidential communication between attorney and client, we proceed. Atwater says that when he entered after the conference, Beach was in bed, "completely out". But, despite the fact that a real attack of hypoglycemia might result in coronary thrombosis, this witness admitted that when he saw his old friend, apparently suffering from such an attack, he merely closed the door and went away with Beach's wife, doing nothing whatever about it. It seems quite apparent, to be charitable, that Beach, instead of then being in the midst of such an attack, was simply drowsing after the conference, as Mrs. Beach evidently knew. The only other testimony bearing on Beach's physical and mental condition at that time is the medical testimony of Dr. Hoyer and Dr. Wuntsch. But it is clear from the testimony of both doctors that Beach's disease subjected him simply to intermittent attacks, between which he was far from being in a state of. collapse, and that since neither of the doctors were at the above conference with the lawyers, neither knew whether or not Beach was then suffering from such an attack. Further, Dr. Wuntsch's testimony is that if Beach is "in one of these attacks" Beach would not "be able to write his name so that you would be able to read it". On the contrary, the physical evidence, the release itself, shows Beach's signature thereto to be in a particularly firm, free and flowing hand. Thus, on plaintiff's own medical theory, the testimony of McGeehan and Brown is corroborated, that at the time Beach signed the release and authorized them to announce and effectuate the settlement he was not under an attack, but was fully competent.

The record is barren of any evidence of fraud, coercion or undue influence exercised by his attorneys on Beach at this time. Indeed, in his lengthy letter of June 4, 1948 to the Judge of this Court then sitting, which goes over the entire situation from Beach's standpoint, Beach makes no such claim against McGeehan and Brown. That Beach's execution of the release and authorization of his attorneys to effectuate the settlement at the first conference was his real and lawful intent is further evidenced by the two letters, clearly not confidential in that regard, which Beach wrote Brown separately several days after the conference, in which he alluded to the settlement as a settled fact, and only noted that the delayed receipt of the moneys might inconvenience him.

■ True, at the end of the present hearing plaintiff's counsel did ask that, since neither Mr. nor Mrs. Beach attended this hearing, their depositions, which may have gone to this point, be marked in evidence. This, however, was refused by the Court, not only because the medical certificate submitted was insufficient to establish to the Court's satisfaction that they were unable to attend and testify, as required, F.R.C.P. 26(d) (3), but also because Beach's own actions previously had raised a grave question in the mind of the Court as to the veracity of his claims in that regard. For, in view of the importance of having this Court see and hear Beach testify personally, since it was his action and mentality that were the basis of the dispute, the Court had gone to great lengths at pre-trial to see that Beach would personally testify, if possible with due regard to his health. The pre-trial order therefore provided that if, before trial, a medical certificate was presented that Beach could not testify personally "the Court will have medical examinations of Beach as to his ability to appear at the trial without endangering his life". So, when advised that this would probably be the situation, the Court, by agreement of counsel, appointed its own med-

ical adviser, the President of the Essex County Medical Society, to make this examination of Beach, and report impartially if he could safely testify personally. Then, to the surprise of all concerned, Beach refused, not simply to testify, but even to permit this impartial medical examiner appointed by the Court to examine him, to see if his condition was, in fact, as he claimed.

However, despite this continued approval by Beach as above of the action of his attorneys in negotiating a settlement agreement, we next find Beach, acting of course both for himself and his corporation, discharging McGeehan and Brown as his attorneys. And so matters rested, on the record at least, till defendant, unable to effectuate the agreed-on settlement, moved for permission to file their plea of accord and satisfaction, as a result of which the hearing occurred before the Court June 7, 1948, the subject of the above appeal. At this hearing Messrs. McGeehan and Brown appeared, not as attorneys for Beach or his company, but because they had been noticed to appear, and Mr. Demarest appeared and presented to the Judge then sitting a letter signed by Beach and his company, introducing Demarest as his attorney. At this hearing there also appeared the attorney for Beach's first wife, who insisted on the right of the wife to attach any proceeds of the present litigation. At the conclusion of this hearing, the Court, after hearing counsel, but without taking testimony, stated that the prayer of the petition should be granted, i. e., to file the plea of accord and satisfaction and to pay the $25,000 settlement money into court. The Court indicated further that the release and a discontinuance of the action should be delivered, but no order, let alone judgment, were entered thereon.

Doubtless Mr. Demarest advised Beach of the occurrences at this hearing. For shortly thereafter Beach, with Atwater, called at the office of Brown, his recently discharged attorney, and directed him to put through the settlement quickly, the reason for the speed obviously being to prevent the settlement moneys falling into the hands of the first Mrs. Beach, as above threatened. To accomplish this, Beach, both individually and as President of plaintiff, signed a letter, witnessed by Atwater and Miss Geiger, Brown's secretary, and the only director of plaintiff, outside of Mr. and Mrs. Beach, asking Brown to have the settlement checks drawn and delivered to him, as specified, and in accordance with the previous agreement. Brown promptly dispatched this letter from Orange by messenger to defendant's attorney in Jersey City, and called McGeehan, on Beach's direction, to have him similarly deliver the release and discontinuance. The very same day, June 8th, the checks were drawn by defendant's attorney as specified, dispatched by messenger and delivered to Brown and McGeehan, who in turn delivered the two checks in question to Beach and his company, retaining the third, which covered legal services. Promptly thereafter the company check was deposited in its bank account and its proceeds drawn on. At the same time, Beach endorsed his check in blank to his bank, apparently cashed it, and then visited his safe deposit box, in which he apparently put the cash, for obvious purposes.

Thus matters remained for some time, with the settlement consummated, the settlement papers in the hands of the defendant, the settlement cash in the hands of Beach and his company, and used as their own by them. No clearer evidence of an accord and satisfaction could be asked.

Plaintiff, however, still insists its case is not settled. It claims that Beach's signing of the release in the corporate name, as well as his own, was not authorized by formal action of the board of directors, they being, in addition to himself, his wife and the stenographer of his lawyer, each holding only a qualifying share, obviously a dummy corporation. The authorities are clear that the strict powers of a normal corporate president, virtute officii, do not

apply to the one in control of a dummy corporation. Renault v. L. N. Renault & Sons, 3 Cir., 1951, 188 F.2d 317; Ritz Realty Corp. v. Eypper & Beckmann, Inc., 1927, 101 N.J.Eq. 403, 138 A. 900, affirmed on opinion below E. & A. 1928, 103 N.J.Eq. 24, 141 A. 921; 13 Am.Jur. Corporations, Sec. 7 and 8; 19 C.J.S., Corporations, page 471, § 1004. But regardless of this, and even assuming the release to be invalid, the plaintiff corporation by later using the settlement proceeds, clearly ratified the action of its President in obtaining this money by such settlement. Murtland Holding Co., v. Egg Harbor Commercial Bank, 123 N.J.Eq. 117, 122, 196 A. 230; Royal Blue Coaches, Inc, v. Delaware River Coach Lines, Inc., Ch. 1947, 140 N.J.Eq. 19, 52 A.2d 763; Throp v. Payne Bros., Inc., E. & A. 1914, 86 N.J.L. 304, 90 A. 1048; Morris County Bldg. & Loan Ass'n v. Walters, E. & A. 1937, 123 N.J.Eq. 548, 198 A. 756; 19 C.J.S., Corporations, page 500, § 1020. The Beach Company is therefore bound by the settlement, just as is Beach, the man who put it through.

It is not clear on the record whether plaintiff claims duress, coercion or fraud on the part of plaintiff's attorneys, Brown and McGeehan, on this occasion, or not. On pre-trial it indicated that such would be a defense. But the only evidence in that regard comes from the lips of Atwater, and plaintiff's counsel is far from clear on the record as to whether or not he desired Atwater's testimony to be considered. At one time he said yes, at another time he indicated the contrary.

But either way the result is the same. For, as seen above, the claim of privilege, the sole basis of objection to Atwater's testimony, and thereupon to Brown's testimony as to this later conference between Beach, Brown and Atwater, applies simply to so much of the testimony as goes to the discussion between Beach and Brown as to the desirability of settlement, legally and factually, i. e., its motivation. It does not lie as to Beach's instructions to Brown to carry

out the settlement, as seen above. And it is only the latter, plus the inferences from what happened in open court, that this Court has so far considered. Upon such basis the consummation of the settlement is clear.

On the other hand, let us give plaintiff the benefit of the remaining alternative—the consideration of Atwater's testimony. Of course, if Atwater's testimony is to be considered, at least insofar as the communications as to the motivation for settlement are concerned between Beach and Brown, at Brown's office, these normally confidential communications between attorney and client are immediately divested of their privilege if Atwater, as the agent of Beach, testifies in open court as to them. This act as Beach's agent is that of Beach, and Beach, by testifying and telling the public of these confidential communications, has turned what was once a confidence into public property. He cannot open the door to part of the facts and close it as to the remainder. 8 Wigmore, (3rd Ed.) Sec. 2327; Shawmut Mining Co. v. Padgett, 1918, 132 Md. 397, 104 A. 40; Wild v. Payson, D.C.S.D.N.Y.1946, 7 F.R.D. 495; Roper v. State, Sup.Ct.1896, 58 N.J.L. 420, 33 A. 969.

But if Atwater is not to be considered as Beach's agent, but as a mere third party, there has never been any privilege in that regard at all. For these communications between Beach and Brown were in the presence of this third party, and hence not confidential when made. 8 Wigmore (3rd Ed.) Sec. 2311; Roper v. State, Sup.Ct.1896, 58 N.J.L. 420, 33 A. 969; American Farm Agency Ind. v. Investors Management Corp., E. & A. 1932, 108 N.J.L. 255, 158 A. 392; LaMoore v. U. S., 9 Cir., 1950, 180 F.2d 49.

When we accordingly consider Atwater's testimony in that regard, we not only find it clearly contradicted by that of Brown, but the admitted facts in that regard support Brown, not Atwater. Had Brown gone to Beach's

home to put the settlement through, then it might be argued that it was Brown who was urging Beach to settle. But on the contrary, it was Beach who, surprisingly, in view of their recent falling out, came to Brown's office. Obviously, it was Beach, therefore, not Brown, who was urging the settlement. It passes all reason to conclude that the one who was urging the settlement was coerced into doing so by the person whom he asked to help put the settlement through.

Finally, plaintiff claims the settlement was coerced by the Court. The sole evidence as to this rather unusual claim is the fact that Beach urged Brown to settle—and that quickly—shortly after the above hearing, and that Beach told Brown, according to Atwater, that he was "going to comply with Judge Fake's suggestion to put through the settlement because of his high regard for Judge Fake". Does this sound like coercion, particularly in the absence of either an order or a judgment of the Court? With the courts open for an appeal from any such "suggestion" by the Court—the very appeal ultimately taken by other attorneys, as above—how can plaintiff justify any such claim? The authorities cited in that regard are either utterly inapposite, or so different in fact as to indicate the lack of substance in such claim. For instance, in Harshaw v. Dobson, 1870, 64 N.C. 384, the Judge in question, in the South in the heat of the Civil War, threatened the party coerced with indictment for crime and imprisonment unless he performed the act in question. Where is the threat of indictment and imprisonment by the Judge here, for whom Beach had such a "high regard"? In Peyser v. Mayor, etc., of City of New York, 1877, 70 N.Y. 497, the Court indicates that judicial coercion arises only when judgment has been entered and execution is being attempted, so that the coercive action cannot be avoided even by an appeal. In the case at bar there was no judgment nor execution, not even a court order. And an appeal, as ultimately taken, was of course available, and would have suf-

ficed to destroy any coercive effect of the action of the Court.

Since a valid agreement of settlement, and settlement, have been effectuated in the controversy involved in the complaint in the above entitled cause, judgment will go, in accordance with the above decision of the United States Court of Appeals for the Third Circuit, for the defendants, both on the limited preliminary issue of accord and satisfaction, and as to the complaint herein.

The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and the conclusions of law required by F.R.C.P. 52.