Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
December 3, 2018

**2018 CO 94**

**No. 18SA92, <u>In re Fox v. Alfini</u> — Attorney-Client Privilege — Discovery — Client with Diminished Mental Capacity.**

In this original proceeding pursuant to C.A.R. 21, the court reviews the district court's order compelling production of a recording of the Petitioner's initial consultation with her attorney.  The district court determined that the recording was not subject to the attorney-client privilege because her parents were present during the consultation and their presence was not required to make the consultation possible.  Further, the district court refused to consider several new arguments that the Petitioner raised in a motion for reconsideration.

The supreme court issued a rule to show cause and now concludes that the presence of a third party during an attorney-client communication will ordinarily destroy the attorney-client privilege unless the third party's presence was reasonably necessary to the consultation or another exception applies.  Here, because the record supports the district court's finding that the Petitioner had not shown that her parents' presence was reasonably necessary to facilitate the communication with counsel, the court perceives no abuse of

discretion in the district court's ruling that the recording at issue was not protected by the attorney-client privilege.

The court further concludes that, under settled law, the district court did not abuse its discretion in refusing to consider the new arguments that the Petitioner raised in her motion for reconsideration.

Accordingly, the court discharges the rule to show cause.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 94

**Supreme Court Case No. 18SA92**
*Original Proceeding Pursuant to C.A.R. 21*
Mesa County District Court Case No. 15CV30797
Honorable Lance Phillip Timbreza, Judge

**In Re**
**Plaintiff:**

Kayla Fox

v.

**Defendants:**

William Alfini, Jr., D.C.; and Brady Chiropractic Group, P.C.

**Rule Discharged**
*en banc*
December 3, 2018

**Attorneys for Plaintiff:**
Leventhal & Puga, P.C.
James Leventhal
Bruce L. Braley
Brian N. Aleinikoff
Benjamin I. Sachs
     *Denver, Colorado*

**Attorneys for Defendant William Alfini, Jr., D.C.:**
Hershey Decker Drake
C. Todd Drake
Kari M. Hershey
Matthew George
     *Lone Tree, Colorado*

**Attorneys for Defendant Brady Chiropractic Group, P.C.:**
Messner Reeves LLP
Katherine Otto
Kendra N. Beckwith
Tanner J. Walls
*Denver, Colorado*

**Attorneys for Amicus Curiae The Colorado Trial Lawyers Association:**
The Komyatte Law Firm LLC
David P. Mason
*Lakewood, Colorado*

Lowrey Parady LLC
J. Bennett Lebsack
*Denver, Colorado*

**Attorneys for Amicus Curiae The Colorado Defense Lawyers Association:**
Wheeler Trigg O'Donnell LLP
Theresa R. Wardon
Abigail S. Wallach
Kevin D. Homiak
Brian S. Osterman
*Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE HOOD** specially concurs.
**JUSTICE SAMOUR** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent.

¶1 In this original proceeding pursuant to C.A.R. 21, we review the district court's order compelling production of a recording of petitioner Kayla Fox's initial consultation with her attorney. The district court determined that the recording was not subject to the attorney-client privilege because her parents were present during the consultation and their presence was not required to make the consultation possible. Further, the district court refused to consider several new arguments that Fox raised in a motion for reconsideration.

¶2 We issued a rule to show cause and now conclude that the presence of a third party during an attorney-client communication will ordinarily destroy the attorney-client privilege unless the third party's presence was reasonably necessary to the consultation or another exception applies. Here, because the record supports the district court's finding that Fox had not shown that her parents' presence was reasonably necessary to facilitate the communication with counsel, we perceive no abuse of discretion in that court's ruling that the recording at issue was not protected by the attorney-client privilege.

¶3 We further conclude that, under settled law, the district court did not abuse its discretion in refusing to consider the new arguments that Fox raised in her motion for reconsideration.

¶4 Accordingly, we discharge the rule to show cause.

## I. Facts and Procedural Background

¶5 Fox, who was then in her early thirties, became seriously ill immediately after receiving chiropractic treatment from Dr. William Alfini, Jr. at the offices of the Brady

3

Chiropractic Group, P.C. in Grand Junction. A massage therapist in the office called Fox's mother, reported that Fox had the flu, and told Fox's mother to come pick up her daughter. Fox's parents arrived shortly thereafter. Realizing that their daughter was gravely ill, they rushed her to the Community Hospital where she received emergency care and treatment for what turned out to be a stroke.

¶6 At some point thereafter, Fox and her parents contacted attorney James Leventhal to discuss a possible malpractice action by Fox against Dr. Alfini and the Brady Chiropractic Group (collectively, "defendants"). Leventhal recorded at least a portion of this initial consultation in order to make sure that he did not miss anything as he sought to learn the facts leading to Fox's stroke and the harm and damages that resulted from it. Notably, the record reveals no effort by Leventhal to determine before conferring with Fox and her parents whether Fox's stroke caused any cognitive deficiencies such that her parents' presence was necessary to facilitate the consultation.

¶7 Subsequently, Fox filed a lawsuit against defendants for, among other things, professional negligence. Discovery ensued, and, during a deposition of Fox's mother, defendants learned that Leventhal had recorded his initial consultation with Fox and her parents. Defendants jointly moved to compel the production of this recording or, in the alternative, for the court's in camera review of the recording to determine if any part of it was discoverable. In their motion, defendants argued that the presence of third parties "vitiate[d] a claim of attorney-client privilege" and that, therefore, the recording was discoverable.

4

¶8 Fox opposed defendants' motion to compel, asserting that she had diminished mental capacity as a result of her stroke. She thus contended that her parents' presence was necessary to facilitate her communications with Leventhal and did not destroy the attorney-client privilege. In support of this argument, Fox attached a neuropsychological evaluation performed fifteen months after her stroke and over a year after the consultation with Leventhal that concluded that she was "likely experiencing ongoing mild difficulties, weaknesses, and/or impairments with her neuropsychological functioning." This evaluation also found "notable," however, that Fox was able to maintain her employment as a middle school counselor. Fox also submitted affidavits from herself and her parents attesting that she believed that she would need her parents' assistance because she did not feel that she had the mental capacity to make decisions that were in her best interest regarding any lawsuit.

¶9 In response to these after-the-fact suggestions of Fox's diminished capacity, defendants submitted records of Fox's social media communications after her stroke and both before and after the recorded consultation took place. In these posts, Fox stated that (1) her caregivers had told her that it was as if she had never had a stroke, "as great as [her] nervous system and brain are," and "it's as if nothing . . . happened"; (2) "I am doing well and I will make a full recovery"; and (3) "They told me this morning that they expect me to make a full recovery and that I am a medical mystery because my stroke symptoms seem to have disapprared [sic]."

¶10 The district court ultimately concluded, "I do not find [Fox's] capacity diminished such that the presence of her parents was necessary to assist in the representation." The

court thus ruled that the attorney-client privilege did not protect the recording and granted defendants' request to compel the production of that recording.

¶11     Fox then moved for reconsideration. In this motion, she argued, for the first time, that the attorney-client privilege attached to the recording because (1) her parents were prospective clients of Leventhal's and (2) her parents were her agents and shared common legal interests with her. She further argued, also for the first time, that the recording was protected under the work-product doctrine and that defendants had not demonstrated substantial need to discover that recording.

¶12     The district court ultimately denied Fox's motion to reconsider, noting that "any arguments raised could have been raised during the pleading stage or at the hearing."

¶13     After obtaining a stay so that she could petition this court for relief, Fox filed the present C.A.R. 21 petition, and we issued a rule to show cause.

## II. Analysis

¶14     We begin by discussing our jurisdiction to hear this matter and the standard of review for discovery orders. We then proceed to review the district court's findings concerning the attorney-client privilege, and we conclude that the court did not abuse its discretion in ordering the discovery of the recording at issue. Finally, we review the district court's denial of Fox's motion for reconsideration, and we conclude that the court did not abuse its discretion in refusing to consider arguments that Fox had raised for the first time in her motion for reconsideration.

6

## A. Original Jurisdiction and Standard of Review

¶15    Exercise of our original jurisdiction under C.A.R. 21 is within our sole discretion. *Fognani v. Young*, 115 P.3d 1268, 1271 (Colo. 2005). An original proceeding under C.A.R. 21 is an extraordinary remedy that is limited in purpose and availability. *Wesp v. Everson*, 33 P.3d 191, 194 (Colo. 2001). Although discovery orders are generally interlocutory in nature and thus reviewable only on appeal, we have exercised our original jurisdiction to review whether a district court abused its discretion in circumstances in which a remedy on appeal would be inadequate. *Gateway Logistics Inc. v. Smay*, 2013 CO 25, ¶ 11, 302 P.3d 235, 238.

¶16    Here, the district court ordered Fox to produce a recording that she claims is protected by the attorney-client privilege. Damage to Fox from the erroneous production of this recording could not be cured by appeal because the damage would occur upon disclosure to defendants regardless of the outcome of an appeal from a final judgment. *Id.* at ¶ 12, 302 P.3d at 239. We therefore conclude that the exercise of our original jurisdiction is appropriate in this case.

¶17    We review a district court's discovery orders for an abuse of discretion. *Id.* at ¶ 13, 302 P.3d at 239. A district court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair. *Id.*

## B. Attorney-Client Privilege

¶18    Fox contends that the district court abused its discretion in finding that the recording at issue was within the scope of discovery permitted by C.R.C.P. 26 because, in Fox's view, the recording is protected by the attorney-client privilege.

7

¶19    The attorney-client privilege "is codified in Colorado by statute and operates to protect communications between attorney and client relating to legal advice." *Wesp*, 33 P.3d at 196. Specifically, section 13-90-107(1)(b), C.R.S. (2018), provides, in pertinent part, "An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment . . . ." The claimant of the privilege has the burden of establishing it, and the burden of establishing a waiver is on the party seeking to overcome the claim of privilege. *See Black v. Sw. Water Conservation Dist.*, 74 P.3d 462, 467 (Colo. App. 2003).

¶20    The attorney-client privilege is not without exception. As pertinent here, we have opined that the presence of a third party during attorney-client communications generally destroys any privilege that might otherwise attach because, "[i]f a client communication is made to an attorney in the presence of a third party, then the communication is ordinarily not considered confidential." *Wesp*, 33 P.3d at 197; *see also D.A.S. v. People*, 863 P.2d 291, 295 (Colo. 1993) (noting that "the presence of a third person ordinarily destroys the confidentiality required to assert the attorney-client privilege").

¶21    If, however, the presence of a third person is necessary to make the conference possible, then that person's presence may not destroy the attorney-client privilege. *D.A.S.*, 863 P.2d at 295; *see also* Colo. RPC 1.14 cmt. 3 ("The client may wish to have family members or other persons participate in discussions with the lawyer. *When necessary to assist in the representation*, the presence of such persons generally does not affect the applicability of the attorney-client evidentiary privilege.") (emphasis added). This is

because, in such circumstances, the third person's presence does not necessarily negate a finding of intended confidentiality. *D.A.S.*, 863 P.2d at 295.

¶22 As the foregoing indicates, to preserve a claim of privilege in cases involving third-party involvement in attorney-client communications, we have required both that the client have an expectation of confidentiality in the communication and that the third party's presence be necessary to facilitate that communication. *See, e.g., id.; see also Wesp*, 33 P.3d at 197 (noting that confidentiality is one of the elements "that must be shown in order for the attorney-client privilege to attach" and that "a communication made in the presence of a third party will not ordinarily receive the protection of the attorney-client privilege").[1]

¶23 Consistent with our above-described case law, Fox does not contend that an expectation of confidentiality alone is sufficient to establish the existence of the attorney-client privilege. Rather, she states that "the essential question is whether [her] parents' presence was necessary 'to assist in the representation.'"

---

[1] Our case law is thus distinguishable from that of jurisdictions in which the existence of the privilege has been deemed to turn not on the necessity of a third party's presence but on the issue of confidentiality or the reasonable expectation thereof. *See, e.g., Kevlik v. Goldstein*, 724 F.2d 844, 849 (1st Cir. 1984) ("The guiding principle in determining whether or not there exists a privileged attorney-client relationship is the intent of the client. The key question in determining the existence of a privileged communication is 'whether the client reasonably understood the conference to be confidential.'") (quoting Charles T. McCormick, *McCormick's Handbook of the Law of Evidence* § 91, at 189 (2d ed. 1972)); *In re Grand Jury Subpoena*, 201 F. Supp. 3d 767, 775 (W.D.N.C. 2016) (noting that the client's intent with respect to confidentiality is determinative of the existence of the privilege).

¶24     As to this issue, the applicable standard governing necessity appears to be an open question in Colorado. Fox contends that necessity should be determined based on whether the lawyer at issue had a subjectively reasonable belief that the third party's presence was necessary to the consultation. Other authority, in contrast, suggests that necessity is to be determined based on an objective standard.

¶25     For example, section 70 of the Restatement (Third) of the Law Governing Lawyers provides that privileged persons include agents of either the client or the lawyer "who facilitate communications between them." Restatement (Third) of the Law Governing Lawyers § 70 (2000). Comment f to that section then explains, in pertinent part, "A person is a confidential agent for communication if the person's participation is reasonably necessary to facilitate the client's communication with a lawyer . . . ." *Id.* at cmt. f.

¶26     Many courts that have addressed this issue likewise appear to have applied an objective standard for determining whether a third party's presence was necessary to facilitate an attorney-client communication. *See, e.g.*, *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 431 (S.D.N.Y. 2013) (concluding that a client waived attorney-client privilege when he shared documents with a public relations firm retained by his attorneys because the client had failed to show that the public relations firm's participation was "'nearly indispensable' or otherwise necessary to facilitate his communications with his attorneys."); *State v. Shire*, 850 S.W.2d 923, 931 (Mo. Ct. App. 1993) ("The presence of a third person . . . such as a relative or friend of the client, who is not essential to the transmission of information or whose presence is not reasonably necessary for the protection of the client's interest, will vitiate the privilege."); *Am. Zurich Ins. Co. v. Mont.*

*Thirteenth Judicial Dist. Court*, 280 P.3d 240, 247 (Mont. 2012) ("Disclosure to third parties waives attorney-client privilege unless disclosure is necessary for the client to obtain informed legal advice.").

¶27 Applying these principles, courts have found that a third party's presence was reasonably necessary when, for example, (1) a prisoner who could not write in English had relied on another person to assist him in writing a letter to his attorney, *State v. Loponio*, 88 A. 1045, 1047–48 (N.J. 1913), and (2) an elderly woman was accompanied by her daughter to a meeting with her attorney and the woman depended on her daughter to put her "sufficiently at ease to communicate effectively with counsel" about "what was probably the most traumatic experience of her life," *Stroh v. Gen. Motors Corp.*, 623 N.Y.S.2d 873, 874 (N.Y. App. Div. 1995) (noting that communications to counsel through one serving as an agent of the client in order to facilitate such communications are generally privileged).

¶28 In contrast, we have found no applicable cases—and Fox cites none—in which necessity was based solely on an attorney's subjective view as to whether a third person's presence was necessary to facilitate an attorney-client communication.

¶29 We are persuaded by those authorities that have adopted an objective standard of necessity and conclude that the presence of a third party during an attorney-client communication will ordinarily destroy the privilege unless the third party's presence was reasonably necessary to the consultation or another exception applies. In our view, such a standard properly protects the attorney-client privilege, avoids the tactical gamesmanship that could result were third parties to be permitted to participate in

11

attorney-client communications without clear and consistent limitations,[2] and allows those who truly need help in communicating with their attorneys to employ such assistance without sacrificing the important protections that the attorney-client privilege affords.

¶30 In reaching this conclusion, we are not persuaded otherwise by Fox's reliance on Colo. RPC 1.14(b). That rule provides, in part, that "the lawyer may take reasonably necessary protective action, including consulting with individuals . . . that have the ability to take action to protect the client" when the lawyer "reasonably believes that the client has diminished capacity." We perceive nothing in this rule that extends the attorney-client privilege to communications involving third persons merely based on the attorney's subjective belief that the third person's presence was necessary to facilitate a consultation. To the contrary, when read as a whole, Colo. RPC 1.14 merely allows an attorney who is representing a client with diminished capacity to take reasonable action (including seeking the appointment of a guardian ad litem, conservator, or guardian) to protect the client's interests and, as part of such action, to reveal confidential information to the extent reasonably necessary to protect those interests. *See* Colo. RPC 1.14 (b)–(c).

---

[2] Examples of such gamesmanship might include an attorney's gathering a client and certain witnesses together to get everyone's story straight or convening a group meeting to try to insulate otherwise nonprivileged and perhaps unhelpful information provided by a third party. In noting these examples, we do not mean to suggest that either Leventhal, Fox, or Fox's parents engaged in such gamesmanship here.

¶31    The question thus becomes whether Fox has demonstrated that her parents' presence was reasonably necessary to the consultation that Leventhal recorded. Addressing this question directly, the district court found that Fox had not shown that her mental capacity was "diminished such that the presence of her parents was necessary to assist in the representation." In so concluding, the court deemed persuasive defendants' evidence demonstrating that Fox had made numerous assertions on social media prior to the meeting with Leventhal indicating that her symptoms had "disapprared [sic]" and that "it's as if nothing happened . . . ." The district court thus concluded that Fox's parents' presence during the consultation destroyed any privilege that would otherwise have attached to a recording of that consultation.

¶32    Because these findings were amply supported by the evidence in the record, we cannot say that the court abused its discretion in concluding that Fox's parents' presence undermined an assertion of privilege, notwithstanding the fact that Fox had introduced evidence to the contrary. It was for the district court to make findings on the conflicting evidence, the record here (including Fox's own conflicting statements) was sufficient to allow the court to do so and supports its findings, and, in such circumstances, we are hesitant to interfere with the court's proper exercise of its discretion in ruling without an evidentiary hearing. *See People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo. 2010) (noting that we will set aside a district court's factual findings only when those findings are so clearly erroneous as to find no support in the record); *People in Interest of M.S.H.*, 656 P.2d 1294, 1297 (Colo. 1983) ("Though the record presents conflicting evidence on some matters, it is the trial court's province to judge the credibility of the witnesses, the

13

sufficiency, probative effect and weight of the evidence, and the inferences and conclusions to be drawn from the evidence.").

¶33    In reaching this conclusion, we are not unmindful of the necessity in some circumstances for clients or prospective clients to have third parties assist them during attorney-client consultations. Nor should our ruling be read to discourage such assistance when it is necessary. We merely conclude that, on the facts of this case, the district court did not err when it found that Fox had not shown the requisite necessity to preserve her claim of privilege.

## C. Arguments Raised on Reconsideration

¶34    Fox next contends that the district court abused its discretion in declining to address her arguments, made for the first time in a motion for reconsideration, that (1) her parents' presence during the initial conference with Leventhal did not destroy the attorney-client privilege because they were prospective clients of Leventhal's, were acting as her agents, and shared a common interest with her in the lawsuit and (2) the recording was protected under the work-product doctrine and defendants had not demonstrated a substantial need to discover that recording.

¶35    C.R.C.P. 121, § 1-15(11) provides, in pertinent part:

> Motions to reconsider interlocutory orders of the court, meaning motions to reconsider other than those governed by C.R.C.P. 59 or 60, are disfavored. A party moving to reconsider must show more than a disagreement with the court's decision. Such a motion must allege a manifest error of fact or law that clearly mandates a different result or other circumstance resulting in manifest injustice.

14

¶36 Colorado cases addressing this rule have consistently concluded that a district court generally does not abuse its discretion by refusing to consider new arguments and evidence submitted in motions to reconsider. *See, e.g.*, *Hice v. Lott*, 223 P.3d 139, 149 (Colo. App. 2009); *Bowlen v. FDIC*, 815 P.2d 1013, 1015 (Colo. App. 1991).

¶37 Moreover, Fox has not explained why she could not have raised these arguments before the district court granted defendants' motion to compel the production of the recording. Nor has she demonstrated that upholding the district court's ruling will result in manifest injustice, particularly given that her parents testified in their depositions, without objection on the ground of privilege, to the conversation with Leventhal and to the facts comprising the substance of the recording at issue. *See Graven v. Vail Assocs., Inc.*, 888 P.2d 310, 316 (Colo. App. 1994) (noting that the plaintiff had neither asserted nor established that the factual information contained in later-filed affidavits was not known by or available to him until after the court had entered its order granting summary judgment, and therefore concluding that the trial court did not abuse its discretion in denying the plaintiff's motion to reconsider, which was based on such new information), *rev'd on other grounds*, 909 P.2d 514 (Colo. 1995); *see also Sousaris v. Miller*, 993 P.2d 539, 547 (Haw. 2000) ("As this court has often stated, '[t]he purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion.' Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding.") (quoting *First Ins. Co. of Haw., Ltd. v. Lawrence*, 881 P.2d 489, 504 (Haw. 1994)).

15

¶38     Accordingly, we cannot say that the district court abused its discretion in declining to consider the arguments that Fox raised for the first time in her motion for reconsideration, and we do not reach the merits of those arguments.

### III. Conclusion

¶39     For these reasons, we conclude that the district court did not abuse its discretion in (1) determining that the recording of the attorney-client conference at issue is not protected by the attorney-client privilege, given the presence of third parties who were not reasonably necessary to facilitate the communication, and (2) declining to consider the new arguments that Fox raised for the first time in her motion for reconsideration.

¶40     Accordingly, we discharge the rule to show cause.

**JUSTICE HOOD** specially concurs.
**JUSTICE SAMOUR** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent.

JUSTICE HOOD, specially concurring.

¶41     I agree with the majority's opinion, and therefore I join it in full. I do so reluctantly, however, because I worry about the chilling effect the court's opinion today might have on some attorneys or parties who legitimately perceive a need to have third parties present at an initial consultation. They will now almost certainly refrain from inviting people like Kayla Fox's parents for fear that a court might later deem their presence at the consultation to have been objectively unnecessary to facilitate communication between the lawyer and prospective client. After all, privilege could be forfeited even when that prospective client is a loved one thirty-five days out from a stroke that might have caused brain damage. Most significantly, I worry about the potential for adversaries to obtain the mental impressions of counsel, however incipient they may be, if a third party was present for the consultation. So, what source of meaningful protection, if any, might someone like Kayla Fox have after our opinion today?

¶42     The work product doctrine strikes me as the most logical refuge for parties on facts like these. Unfortunately for Ms. Fox, invocation of that doctrine came too late. (Of course, disclosure in this instance might not matter much. While no judicial officer has listened to the tape, some of what occurred during the initial consultation has already been revealed, without objection or calamity, during depositions.) Still, it's worth emphasizing that a recording of, or notes about, an initial consultation would typically constitute (1) "tangible things," (2) "prepared in anticipation of litigation," and (3) "by or for another party or by or for that other party's representative" and, thus, are discoverable

1

"only upon a showing that the party seeking discovery has substantial need of the materials . . . and is unable without undue hardship to obtain the substantial equivalent of the materials by other means." C.R.C.P. 26(b)(3); *see generally* 8 Charles Alan Wright et al., *Federal Practice and Procedure* § 2024 (3d ed. 2018) (identifying these elements of work product under the corresponding federal rule).

¶43　We have noted that a party "demonstrates substantial need by establishing that the material requested contains critical factual information necessary to prove the party's case." *Cardenas v. Jerath*, 180 P.3d 415, 422 (Colo. 2008). And "[a] party is unable without undue hardship to obtain the substantial equivalent of the materials by other means when the requested materials are not available by any other source." *Id.* So, the substantial need hurdle can offer the Kayla Foxes of the world some protection.

¶44　Perhaps more importantly, the work product doctrine further provides that certain materials prepared in anticipation of litigation or for trial may never be discovered: "[T]he court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." C.R.C.P. 26(b)(3); *Cardenas*, 180 P.3d at 423. Therefore, on facts like those here, timely assertion of work product immunity should enable the party resisting discovery to seek redaction of an attorney's mental impressions.

¶45　And, unlike the attorney-client privilege, voluntary disclosure of information to third parties does not ordinarily constitute a waiver of exemption from discovery under the work product doctrine, unless such disclosure is to an adversary in the litigation. *See,*

2

*e.g., Blattman v. Scaramellino,* 891 F.3d 1, 5 (1st Cir. 2018) ("[D]isclosure of work product to a third party does not necessarily waive the protection; 'only disclosing material in a way inconsistent with keeping it from an adversary waives work product protection.'" (quoting *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997))); *United States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010) ("[D]isclosing work product to a third party can waive protection if 'such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary. . . .'" (quoting *Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 605 (D.C. Cir. 2001))); Wright, *supra*, § 2024 (noting that this is the majority rule because privilege is based on the confidential nature of the communication, which arguably vanishes if the evidence is revealed to any third party, while work product immunity protects the evidence from discovery by an opponent and concluding that cases to the contrary simply conflate work product immunity and attorney-client privilege); *cf.* 23 Sheila K. Hyatt, *Colorado Practice Series*, *Evidence Law* § 501:4 (2018) ("The work product doctrine . . . is not so much a privilege as it is an exemption for material prepared by or for the attorney of a party in anticipation of litigation.  Its purpose is to protect the attorney's privacy in the course of preparing a case for trial.  It does not necessarily involve confidential communications.").

¶46 Work product materials enjoy a qualified immunity from discovery because "the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to the orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate

3

reasons to justify production." *Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Court,* 718 P.2d 1044, 1047 (Colo. 1986) (quoting *Hickman v. Taylor*, 329 U.S. 495 (1947)). Respondents overcame that burden here, perhaps primarily because of a procedural quirk. But the work product doctrine should still provide meaningful protection in other cases.

¶47     With these thoughts in mind, I respectfully concur.

JUSTICE SAMOUR, dissenting.

¶48 The majority's decision to discharge the rule to show cause is tethered to the district court's factual finding that Fox's parents did not need to be present during the consultation with Leventhal. But the district court did not hold an evidentiary hearing to resolve the conflicts in the exhibits submitted with the parties' briefs. Instead, it made credibility assessments, resolved evidentiary conflicts, and reached factual findings based entirely on the paper record. Because I believe the district court erred in failing to hold an evidentiary hearing, I respectfully dissent.

¶49 The district court found that Fox was fully able to communicate, relate her symptoms, and describe her chiropractic adjustment in detail when she met with Leventhal and, therefore, her mental capacity was not so diminished that her parents' presence was necessary to assist during the consultation. In making this factual determination, the district court considered what are best characterized as the parties' offers of proof and concluded that defendants' proffer was more persuasive than Fox's. Respectfully, I cannot endorse this approach.

¶50 Without the benefit of live testimony, the district court deemed the affidavits submitted by Fox and her parents unconvincing. In those affidavits, Fox and her parents declared, under oath and subject to penalty of perjury, that:

- the stroke affected nearly every aspect of Fox's life, including her ability to live independently for a significant period of time;

- Fox's ability to concentrate, remember, and understand complex issues was significantly impaired when she met with Leventhal;

1

- during the timeframe of the consultation with Leventhal, Fox needed her parents to help her "understand a number of important issues in [her] life";

- Fox's parents spent significant time with Fox after the stroke to make sure she was doing well physically and "understood everything going on around her and was making well-reasoned decisions"; and

- Fox's parents attended the meeting with Leventhal because Fox and her parents realized that she needed assistance in understanding some of the complex issues that would come up during the meeting and because she did not feel she had the mental capacity to make decisions that were in her best interest concerning this lawsuit.

¶51 Not only did the district court dismiss these attestations, it ignored the report regarding Fox's neuropsychological evaluation. That report observed that tests conducted on Fox revealed, among other things:

- difficulties and impairments with aspects of her ability to maintain her attention and to process information;

- variability in her memory and ability to learn tasks;

- an elevated level of psychological distress, which included experiencing symptoms associated with depression and anxiety; and

- likely ongoing impairments with neuropsychological functioning.

Notably, the report mentioned that, since the evaluation had occurred approximately fifteen months after the stroke, it was likely that Fox had already experienced the majority of the anticipated recovery. In other words, had the tests been administered shortly after the stroke and before the consultation with Leventhal, the results may well have reflected greater neuropsychological impairment.

¶52 On the other side of the ledger were Facebook messages sent from Fox's account. These messages, which were sent before the consultation with Leventhal, indicated that:

2

(1) Fox was "doing well" and expected to make "a full recovery"; and (2) her caregivers had told her that her symptoms had disappeared, that she was "a medical mystery," and that it was "as if nothing . . . happened" to her. The district court took these comments at face value and accorded them great weight. But the Facebook remarks, which were not made under oath, were contradicted by Fox's and her parents' sworn statements, and were at least undermined by the neuropsychological report. Yet the district court resolved the conflicts in the exhibits—and in the process necessarily made credibility assessments—on a cold record. It is now axiomatic that "[a] cold record is a poor substitute for live testimony." *People v. Scott*, 600 P.2d 68, 69 (Colo. 1979). It is for that reason that "[f]actfinding is the basic responsibility of district courts, rather than appellate courts." *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982) (quoting *DeMarco v. United States*, 415 U.S. 449, 450 n. (1974)).

¶53 The majority cites *People in Interest of M.S.H.* and *People in Interest of A.J.L.*—the former for the proposition that it is "the trial court's province to judge the credibility of the witnesses," 656 P.2d 1294, 1297 (Colo. 1983), and the latter for the proposition that it is for the district court to resolve conflicts in the evidence, 243 P.3d 244, 250 (Colo. 2010). *See* maj. op. ¶ 32. I wholeheartedly agree with both principles. But the district court did not, and could not, properly perform either function because it failed to hold an evidentiary hearing. How could the district court properly assess the credibility of the witnesses without observing them and receiving their live testimony? And how could

3

the district court properly resolve the conflicts in the exhibits without properly assessing the credibility of the witnesses?

¶54 Invoking a basic tenet of appellate jurisprudence, the majority points out that we do not set aside a district court's factual findings unless we determine that those findings are so clearly erroneous as to find no support in the record. However, the very reason we generally employ such a deferential standard in reviewing a district court's factual findings is that the district court is in a unique position to assess the credibility of live witnesses, and therefore, to resolve conflicting evidence and determine the historical facts. *People v. Trujillo*, 784 P.2d 788, 792 (Colo. 1990), *abrogated on other grounds*, *People v. Matheny*, 46 P.3d 453 (Colo. 2002). As we have explained:

> The sanctity of trial court findings is derived from the recognition that the trial judge's presence during the presentation of testimonial evidence provides an unparalleled opportunity to determine the credibility of the witnesses and the weight to be afforded the evidence which is before the court. [Where] [t]he testimony of the parties [is] contradictory on almost every material point in controversy[,] [i]t is impossible to determine from the bare pages of the record whose testimony should be given credit relating to the facts. In such cases, the difficult task of finding those facts is best left to the trial court.

*M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1384 (Colo. 1994) (quoting *Page v. Clark*, 592 P.2d 792, 796 (Colo. 1979)) (citation omitted).

¶55 Here, the factual findings deserve no deference because we are in the same position to do what the district court did. The district court did not observe, much less evaluate, the demeanor or the body language of any live witnesses—indeed, there were no live witnesses. By electing to make credibility assessments, resolve conflicts in the

4

exhibits, and reach factual determinations on a cold record, the district court nullified its unique position to make factual findings and placed itself in the disadvantaged shoes of a reviewing court. The district court then proceeded to do precisely what a reviewing court abstains from doing because of the real danger of engaging in fact-finding on a cold record.

¶56 In the end, while the majority concludes that there is ample evidence in the record to support the district court's factual findings, it overlooks that there is equally ample evidence in the record to support contrary factual findings. Given the conflicts in the exhibits, the only way to properly settle the parties' factual dispute was to hold an evidentiary hearing.

¶57 Because the district court made credibility assessments, resolved the conflicts in the exhibits, and reached factual findings based entirely on the paper record without holding an evidentiary hearing, I respectfully dissent. The district court necessarily engaged in speculation to determine what to believe. In my view, this was error. I would make the rule to show cause absolute and remand for an evidentiary hearing in accordance with the legal test endorsed by the majority.

I am authorized to state that CHIEF JUSTICE COATS and JUSTICE BOATRIGHT join in this dissent.

5