22CA1662 Peo v Tarango 02-20-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1662
Adams County District Court No. 19CR2031
Honorable Patrick H. Pugh, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Ramón Antonio Tarango,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE DUNN
Tow and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 20, 2025

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

2nd-Chair, Britta Kruse, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    A jury convicted defendant, Ramón Antonio Tarango, of two counts of sexual assault on a child, two counts of sexual assault on a child as part of a pattern of abuse, and two counts of sexual assault on a child by one in a position of trust.  He appeals these convictions.  We affirm.

I.    Background

¶ 2    Tarango and his wife married in the late 1990s.  When they married, she had two sons from an earlier relationship.  One of her sons had a stepdaughter, C.M., and the other son had a daughter, A.A.  C.M. and A.A. separately visited their grandparents' home at various times throughout their childhoods.

¶ 3    Around the time C.M. turned nineteen, she alleged that, between the ages of seven and eleven, Tarango had sexually assaulted her on multiple occasions during these visits.  After A.A.'s father learned about C.M.'s allegations, he asked A.A. if Tarango had done anything to her.  A.A. initially said no but admitted soon after that Tarango had sexually assaulted her between the ages of twelve and fourteen.

¶ 4     The outcries prompted an investigation.  As part of the investigation, police interviewed C.M. and, a few months later, facilitated a forensic interview with A.A.

¶ 5     As to each victim, the prosecution charged Tarango with one count of sexual assault on a child, one count of sexual assault on a child as part of a pattern of abuse, and one count of sexual assault on a child by one in a position of trust.

¶ 6     At trial, the jury heard directly from C.M., A.A., and Tarango. Tarango denied the allegations and testified that he never touched C.M. or A.A. inappropriately.  He defended on the theory that C.M. and A.A. falsely accused him for different reasons.  Specifically, defense counsel argued that C.M.'s allegations stemmed from a combination of her mental illness, difficulties with family and other relationships, and a general dishonest character.  And he argued that C.M. influenced A.A., who has an intellectual and cognitive disability, to make similar corroborating allegations.

¶ 7     The jury rejected Tarango's theory and convicted him as charged.  The trial court sentenced him to a controlling term of eight years to life in prison.

¶ 8    On appeal, Tarango contends that the trial court reversibly erred by (1) allowing the prosecution's advisory witness to "opine on witness credibility and the correct interpretation of" contested facts relevant to his defense theory; (2) admitting evidence that was "tantamount to an opinion" on the truthfulness of C.M.'s allegations and that constituted "irrelevant and unfairly prejudicial victim impact evidence"; (3) refusing to review and disclose C.M.'s mental health records; and (4) refusing to review and disclose A.A.'s education records.  We address each contention in turn.

## II.    Lay Opinion Testimony

¶ 9    Tarango contends that the trial court erred by allowing the prosecution's advisory witness to provide lay opinion testimony on witness credibility and his interpretation of the timeline of certain events.

### A.    Additional Background

¶ 10    As part of the investigation, Detective Matthew Peterson interviewed C.M. in February 2019.  In April 2019, a forensic interviewer conducted a forensic interview with A.A.  Both interviews were recorded.  During their respective interviews, C.M.

and A.A. each disclosed sexual abuse by Tarango, though the described acts against each victim were different.

¶ 11      At some point around these interviews, C.M. and A.A. met at a Starbucks coffee shop (the Starbucks meeting). As part of his theory that C.M. influenced A.A. to falsely accuse him of sexual assault, Tarango argued that the Starbucks meeting occurred before either interview, allowing C.M. to share the details of her allegations against Tarango with A.A.

¶ 12      The trial testimony and evidence as to the exact date of the Starbucks meeting was conflicting and unclear. A.A. didn't know when the Starbucks meeting occurred. C.M.'s mother stated that the Starbucks meeting "definitely" happened after C.M.'s interview but wasn't sure whether it happened before or after A.A.'s interview. And C.M. went back and forth about whether the Starbucks meeting happened before or after their respective interviews. Recordings of C.M.'s interview and later phone calls with police similarly provided conflicting accounts on the timing of the Starbucks meeting.

¶ 13      Beyond conducting the investigation, Detective Peterson served as the prosecution's advisory witness and was present

throughout trial. On direct examination, the prosecution asked Detective Peterson if, based on his investigation, he understood when the Starbucks meeting occurred. Defense counsel objected, arguing that it was "for the jury to determine" the facts and that the detective was "not qualified" to give "opinions about the facts." The prosecution countered that the detective could testify to the timeline of the investigation and to his understanding of when the Starbucks meeting occurred based on "his interviews," "his investigation," and "what people have told him that is consistent or inconsistent with what was said in court." Defense counsel replied that it would be "confusing and unnecessarily bolstering a lot of people's testimony" for Detective Peterson to opine about which timeline of events was correct given the "different versions on the record."

¶ 14    The trial court ruled that Detective Peterson could testify to "what his interpretation would be" so long as the prosecution laid a proper foundation. The court noted that his testimony would be subject to cross-examination and that any questions would be subject to objection.

¶ 15    The following exchange then occurred:

[Prosecutor:] [S]o we were talking about the timing of those various conversations.

Is it fair to say that you've spoken to quite a few different witnesses in this case?

[Detective Peterson:] Yes, ma'am.

[Prosecutor:] Have you attempted to understand the timeline of these various events throughout those interviews?

[Detective Peterson:] I have.

[Prosecutor:] Is it fair to say that there are some discrepancies about when things took place in this case? . . .

[Detective Peterson:] Yes, there has been.

[Prosecutor:] Now, I'm just going to ask you about a couple of these things. Do you know, based on your investigation, when the Starbucks conversation occurred?

[Detective Peterson:] Yes.

[Prosecutor:] How do you know when the conversation occurred?

[Detective Peterson:] So in the December 31st 2019 conversation with [C.M.], she does bring up that she and [A.A.] met up at Starbucks. And she makes very specific mention that [A.A.] says the police had come to my school and talked to me about this matter. And that occurred in April of 2019.

So this meeting at Starbucks occurred some time after April of 2019 when that interview, the forensic interview at the school, was

conducted with [A.A.] And it was after my original interview . . . in February of 2019.

[Prosecutor:] So if there's any statement about this happening in January or February, is it possible that that occurred?.

[Detective Peterson:] I don't see how it could because --

¶ 16 Defense counsel again objected, asserting that it was improper for Detective Peterson to opine on the truthfulness of C.M.'s statements about the timing of the Starbucks meeting. The court sustained the objection, and the prosecutor rephrased:

[Prosecutor:] Detective, when was [C.M.'s] interview with law enforcement[?]

[Detective Peterson:] February 26th of 2019.

[Prosecutor:] Is it you[r] understanding that the conversation happened before or after that?

[Detective Peterson:] It happened after that.

[Prosecutor:] Okay. So that's two days before February is over.

[Detective Peterson:] I believe so, yeah.

[Prosecutor:] Because there's 28 days in February.

[Detective Peterson:] I believe so.

¶ 17     The prosecutor then moved on, and defense counsel raised no further objections.

¶ 18     Defense counsel thoroughly cross-examined Detective Peterson about inconsistent statements regarding the timing of the Starbucks meeting.

### B.     Preservation and Standard of Review

¶ 19     We reject the People's assertion that Tarango didn't preserve this issue for appeal because neither of his two objections specifically referenced CRE 701.  While it's true that Tarango didn't cite CRE 701, he nevertheless alerted the court to his concern that it was improper for Detective Peterson to opine on when the Starbucks meeting occurred.  And, from the discussion surrounding Tarango's first objection, it's clear that the court understood Tarango's concern that Detective Peterson was offering an "interpretation" of events based on "conversations in which he did not participate" and "was not present" for.  Because Tarango's objections were sufficiently specific to alert the court to the issue he raises on appeal, we conclude the issue is preserved.  *See People v. McFee*, 2016 COA 97, ¶ 31.

¶ 20     We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Snelling*, 2022 COA 116M, ¶ 31. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, unfair, or when it misapplies the law. *Id.*

¶ 21     We review preserved evidentiary claims for harmless error, meaning we reverse only if the error substantially influenced the verdict or affected the fairness of the trial proceedings. *Id.* at ¶ 32.

### C.   The Court Erred by Admitting Detective Peterson's Lay Opinion Testimony

¶ 22     Under CRE 701, a lay witness may testify to opinions or inferences so long as they are (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of CRE 702. Lay opinion testimony is permitted because "it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a firsthand witness to a particular event." *McFee*, ¶ 76 (quoting *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013)). A lay

witness's opinion is not helpful to the jury, and therefore improper, if it's based on the same information that the jury has. *See id.*

¶ 23 Detective Peterson had no firsthand knowledge about the Starbucks meeting date. Contrary to the People's assertion, he didn't testify to any "facts developed during his investigation" to support his opinion as to when the meeting occurred. For instance, he didn't testify that he determined the date based on evidence such as calendar entries, surveillance videos, or interviews with Starbucks employees. Rather, he opined on the meeting date based on C.M.'s statements. But C.M. gave conflicting statements about the meeting date, and Detective Peterson was in no better position than the jury to resolve the conflicting statements. Thus, Detective Peterson's opinion about the Starbucks meeting date was not based on personal knowledge, "could not have been helpful to the jury," and was not proper lay opinion testimony. *Id.*; *see also People v. Vergari*, 2022 COA 95, ¶ 19 (lay witness improperly opined on contents of video recordings because witness lacked personal

knowledge of recordings and did not rely on expertise to help the jury understand what the recordings depicted).[1]

¶ 24    We are not otherwise persuaded by the People's contention that Detective Peterson's opinion was helpful to the jury because "it assisted the jury in understanding the timeline of events, especially in the context of [the detective's] investigation."  As explained, though he attempted to couch his opinion in terms of his "investigation," Detective Peterson did nothing more than select one of C.M.'s varying accounts about when the Starbucks meeting occurred.  But the jury had the same information and was competent to reach its own conclusion on when that meeting occurred.  *See McFee*, ¶ 76 (a witness "may not form conclusions for jurors that they are competent to reach on their own").

¶ 25    Even so, for several reasons, we conclude that the error was harmless.

---

[1] Tarango offers additional reasons for concluding the detective offered improper lay opinion testimony, including that it bolstered C.M.'s credibility, relied on specialized knowledge, and alluded to facts not in evidence.  Because we agree the court erred by admitting lay opinion testimony that wasn't helpful to the jury, we needn't consider these additional contentions.

¶ 26    First, the detective's improper opinion comprised a couple lines of testimony in a five-day trial with twenty-one witnesses.  And the prosecution never again referenced the detective's opinion on the timing of the Starbucks meeting.  Even more than that, the prosecutor seemingly disavowed it by candidly admitting in rebuttal closing argument that "no one knows" when the Starbucks meeting occurred and that C.M., A.A., and C.M.'s mother "couldn't tell you a date."

¶ 27    Second, the jury heard directly from C.M. about the meeting date, and it could independently evaluate and assess C.M.'s recorded and testimonial statements — some of which supported Tarango's theory that the Starbucks meeting occurred before the interviews.  *See id.* at ¶ 78 (concluding admission of detective's lay opinion testimony concerning recorded interviews was harmless because "[t]he jury listened to both recordings and was instructed to come to its own conclusion about what [the defendant] had said"); *Vergari,* ¶ 20 (concluding admission of lay opinion testimony about video recordings was harmless because the jury "watched the videos," "had access to them during deliberations," and was "free to disregard [the] opinion and come to its own conclusions").

¶ 28    Third, the timing of the Starbucks meeting is separate from what happened at the meeting, which was also disputed at trial. The detective offered no opinion on what C.M. and A.A. discussed at the meeting.  In contrast, C.M. and A.A. both testified that they didn't "go into detail" about the sexual assaults at the Starbucks meeting.  And, more fundamentally, C.M. and A.A. testified about different acts of sexual abuse committed by Tarango.  Thus, the jury was also able to independently consider and assess the testimony about the content of that meeting.

¶ 29    Fourth, and relatedly, regardless of whether the Starbucks meeting occurred before the interviews, it was undisputed that C.M. and A.A. had already each disclosed the sexual abuse.  The jury heard testimony that C.M.'s formal outcry occurred during her hospitalization.  But before C.M.'s formal outcry, the jury also heard that C.M. had disclosed the abuse to another cousin during childhood, then to a friend in early high school, then to her biological father when she was sixteen or seventeen, and then to her aunt (though the precise timing and order of these disclosures was disputed and unclear).  And it heard that A.A. had first disclosed the abuse to her biological mother before later reporting

13

the abuse to her father after he asked her about it.[2]  Because the outcries occurred before the Starbucks meeting (whenever it occurred), C.M. and A.A. couldn't have hatched the allegations at the Starbucks meeting.  Thus, contrary to Tarango's suggestion that the detective's testimony "effectively eliminated" his defense, the date of the Starbucks meeting was modestly important and bore little on the ultimate issue of whether Tarango sexually assaulted C.M. and A.A.

¶ 30    For all these reasons, we conclude that the court's admission of the detective's improper but brief lay opinion testimony did not substantially influence the verdict or affect the fairness of trial.

### III.    The Unredacted Police Interview

¶ 31    Next, Tarango contends that the trial court erred by admitting an unredacted video recording of C.M.'s police interview. Specifically, he says the court improperly admitted (1) "evidence

---

[2] A.A. testified that her biological mother didn't believe her when she disclosed the abuse.  When asked why she initially responded "no" after her father asked if Tarango had abused her, A.A. explained that she was "afraid he wouldn't believe me like my mom didn't."

14

tantamount to an opinion on the veracity of" C.M.'s allegations, and

(2) irrelevant and prejudicial victim impact evidence.  We disagree.

### A.    Additional Background

¶ 32    Tarango asked the court to redact two portions of C.M.'s February 2019 recorded police interview.  The first portion involved the following comments that Detective Peterson made to C.M. toward the end of the interview after she had recounted her sexual assault allegations:

> I wanted to let you know, you had mentioned to me that you didn't want to break up the family and things like that, and I hear that from young people so often.  I just want you to know that none of this was your fault.  Him leaving the house was not your fault, his behavior is not your fault.  This is all on him. Those are the actions he chose to do.
>
> . . . .
>
> So I don't ever want you to feel any responsibility at all.

¶ 33    Tarango objected under CRE 401 and 403, arguing that the detective's "counseling" and reference to his experience with other "young people" was not relevant to C.M.'s allegations and was unfairly prejudicial because it garnered sympathy for C.M.  The prosecution responded that Detective Peterson's comments were

relevant to show the rapport he built with C.M., which is an important aspect of interviewing victims of abuse, and that the comments were not unfairly prejudicial.

¶ 34 The court declined to redact the detective's comments, ruling that his attempt to build rapport with C.M. was relevant and that his comments were not unfairly prejudicial.

¶ 35 Tarango also asked the court to redact a second portion of the interview in which C.M. described how the sexual assaults had affected her and her relationships with family members and others. She explained:

> Um, I feel like it ruins a lot of my family relationships, and just relationships in general, um, I'm not – I'm close with my family, but I am not affectionate with them, like I don't like to hug, I don't like, you know like when you – like when my mom will see me she'll kiss me on the cheek, I don't like stuff like that. I don't like hugging for too long, um, it's just – it's like, it's annoying, cuz I can't even tell like my mom that I love her without feeling like weird about it, or telling like my stepdad that I love him without feeling weird about it, or hanging out with my cousins that are boys and feeling weird around them. It just made me feel like I can't trust, not even family.
>
> . . . .

16

And so, um, in high school I had a boyfriend, and then once I was out of high school, um, I had a girlfriend, and our relationship was okay, but we just fought a lot because I can't – I don't trust anybody, and um, like I didn't like to be touched, and it just made them like kind of drift away from me, and then um, I was in another relationship that was abusive, and I just kind of like let it happen, because I think that's – I feel like things that people do are okay to me, so like what [Tarango] did to me at the time, I felt like that was just something normal, or it just happens, and then like now that I'm older, like when people treat me a certain way, I think it's okay because that's just how some people are, and I think that's ruined a lot of things for me.

¶ 36     Tarango again objected under CRE 401 and 403.[3] Though it's unclear whether Tarango characterized the evidence as victim impact evidence, the court interpreted the objection as a victim impact objection. The prosecution countered that C.M.'s comments were relevant to rehabilitate her credibility and to rebut Tarango's claim that she fabricated the allegations.

---

[3] Though defense counsel objected to this entire passage, he also argued, seemingly in conflict, that the latter portion discussing C.M.'s abusive relationship was relevant and admissible because the "abusive nature of the relationship impacts [C.M.'s] credibility with respect to the truthfulness of the allegations she's making" and "the jury should know what was actually going on in her life before she made this complaint."

¶ 37    The court declined to redact C.M.'s comments, remarking that there had already been previous testimony about how the incidents affected C.M. and ruling that the comments were relevant to her credibility and were not unfairly prejudicial.

¶ 38    At trial, the court admitted and published C.M.'s unredacted interview to the jury. During deliberations, the jury asked to review the interview again.

### B.    Standard of Review and Applicable Law

¶ 39    As before, we review a trial court's evidentiary rulings for an abuse of discretion. *Snelling*, ¶ 31.

¶ 40    We review preserved evidentiary objections for harmless error and unpreserved objections for plain error. *Id.* at ¶¶ 32-33. "Plain error is obvious and substantial." *Hagos v. People*, 2012 CO 63, ¶ 14. An error is obvious if it contravenes a clear statutory command, a well-settled legal principle, or Colorado case law. *People v. Crabtree*, 2024 CO 40M, ¶ 42.

¶ 41    Colorado favors the admissibility of relevant evidence unless otherwise prohibited by constitution, statute, or rule. *People v. Hood*, 2024 COA 27, ¶ 19; CRE 402. Evidence is relevant if it tends to make the existence of a fact of consequence more or less

18

probable. CRE 401. But relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." CRE 403. When reviewing an evidentiary ruling, "we assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *Hood*, ¶ 19 (quoting *People v. Clark*, 2015 COA 44, ¶ 18).

### C. The Court Didn't Plainly Err by Admitting Detective Peterson's Comments

¶ 42 To start, Tarango didn't preserve his argument that Detective Peterson's comments made in the give and take of C.M.'s interview were "tantamount to an opinion on the veracity" of her allegations. At trial, Tarango objected only that the detective's comments were irrelevant and were unfairly prejudicial. Because Tarango didn't alert the court to the particular objection he now raises on appeal, we review for plain error.[4] *See People v. Tallent*, 2021 CO 68, ¶ 12 ("When a party presents a new argument or alters the grounds for

---

[4] Though Tarango preserved his objections to relevancy and unfair prejudice, he doesn't separately challenge the court's ruling that the comments were relevant and not unfairly prejudicial. To the extent he addresses the court's ruling, he does so within the context of his improper bolstering argument. We therefore do the same.

an objection on appeal, the issue is forfeited and reviewable only for plain error.").

¶ 43    We agree with Tarango that a witness may not testify, either directly or indirectly, as to whether a victim is telling the truth. *See Venalonzo v. People*, 2017 CO 9, ¶ 32. But the detective never testified at trial — either directly or indirectly — that he believed C.M. or thought her allegations were credible. And Tarango points us to no authority applying *Venalonzo*'s prohibition to comments made during a witness interview and later introduced at trial. *See id.* at ¶¶ 32-33 (discussing prohibition in terms of one witness testifying about another witness's credibility).

¶ 44    But even assuming *Venalonzo* applies to witness interviews, we don't interpret the detective's brief comments that C.M. was not at "fault" or "responsibl[e]" for some apparent family turmoil as commenting on her credibility or the truthfulness of her allegations. Though he reassured C.M. during the interview, he never said he believed her. Thus, the detective's interview comments "did not so obviously constitute improper bolstering as to amount to plain error." *Id.* at ¶ 37 n.6; *see also Crabtree*, ¶ 42 (To be plain, the error must be "so clear-cut" and "so obvious" that the trial court

"should be able to avoid it without benefit of objection.") (quoting *Romero v. People*, 2017 CO 37, ¶ 6).

¶ 45 We therefore conclude that the trial court did not plainly err or otherwise abuse its discretion by admitting the detective's comments.

## D. The Impact Comments

¶ 46 Tarango argues that the trial court reversibly erred by admitting C.M.'s comments about how the sexual assaults affected her relationships with family and others. He contends that such victim impact evidence is "presumptively irrelevant and inadmissible" during the guilt–innocence stage of trial.

¶ 47 Evidence that describes the physical, emotional, or social impact of a crime on its victim — like C.M.'s comments to Detective Peterson — is not presumptively irrelevant. *See People v. Martinez*, 2020 COA 141, ¶¶ 29, 33. Rather, victim impact evidence may be admissible during the guilt–innocence phase of a trial if it's relevant to prove whether a defendant committed the charged crime. *Id.* at ¶ 33; *People v. Mena*, 2025 COA 14, ¶ 15; *see also Payne v. Tennessee*, 501 U.S. 808, 823 (1991) ("In many cases the evidence relating to the victim is . . . relevan[t] at the guilt phase of the

21

trial."); *Schreibvogel v. State*, 2010 WY 45, ¶ 22 (noting that relevancy is the "key inquiry" in determining the admissibility of victim impact testimony during the guilt–innocence phase of trial; cited favorably in *Martinez*).  Relevant evidence includes any evidence that makes it more or less probable that a criminal act occurred.  CRE 401; *Clark*, ¶ 17.

¶ 48     The People argue that C.M.'s impact comments were relevant to rebut Tarango's fabrication defense and to rehabilitate C.M.'s credibility.  Tarango responds that C.M.'s comments were irrelevant because they didn't make it more likely that he committed sexual assault and, even assuming the comments had "some minimal probative value," the probative value was significantly outweighed by the undue risk of sympathy for C.M.

¶ 49     Under these circumstances, we conclude that C.M.'s statements explaining the relational impacts she experienced from the assaults were relevant to determining guilt.  The central issue at trial was whether C.M. fabricated the sexual assault allegations against Tarango and manipulated A.A. into doing the same.  From the opening statement through closing argument, Tarango relentlessly attacked C.M.'s credibility.  And because C.M.'s

testimony was the only direct evidence of the assault, her brief comments explaining how the sexual assault had impacted her had some tendency to make it less probable that she fabricated the allegations. Thus, the impact evidence here was relevant to rebut the fabrication defense and had a tendency to make it more probable that a "criminal act occurred" and that Tarango "was the perpetrator." *Clark*, ¶ 17; *accord Mena*, ¶¶ 20-24 (victim impact evidence was relevant to whether the victim's sexual assault accusations were true or fabricated because her credibility "was the linchpin of the case"); *see also King v. State*, 2023 WY 36, ¶ 39 (explaining that victim impact evidence may be relevant "for a proper purpose" such as to show "whether the [sexual assault] incident occurred at all" or "to bolster a witness's credibility after it is attacked"; collecting cases); *Cueva v. State*, 339 S.W.3d 839, 880-81 (Tex. Ct. App. 2011) (victim impact evidence was relevant and admissible because the defendant claimed the victim and her mother fabricated the incident).

¶ 50    Of course, we acknowledge that C.M.'s comments weren't helpful to Tarango's defense. But assuming "the maximum probative value that a reasonable fact finder might give the evidence

23

and the minimum unfair prejudice to be reasonably expected," *Hood*, ¶ 19, we can't say that C.M.'s interview comments — which occupied a few minutes of a five-day trial and were not repeated in live testimony or closing argument — were unfairly prejudicial, *see Mena*, ¶ 27 (concluding any unfair prejudice resulting from the victim's impact testimony was unlikely to substantially outweigh the relevance of that testimony, which was "highly probative of her credibility, a central issue in the case"); *see also People v. Dist. Ct.*, 785 P.2d 141, 147 (Colo. 1990) ("The trial court should not exclude proffered evidence as unfairly prejudicial simply because it damages the defendant's case.").

¶ 51 In sum, we conclude the trial court's decision to admit C.M.'s victim impact evidence was not manifestly arbitrary, unreasonable, or unfair.

## IV. The Mental Health Records

¶ 52 Tarango asks us to remand to the trial court because, in his view, the court failed to review and disclose information from C.M.'s mental health records.

## A. The Original Motion

¶ 53    Before trial, Tarango filed a motion for disclosure of C.M.'s "therapy records." He requested the opportunity to subpoena C.M.'s mental health records and asked the court to review the records in camera for relevant and exculpatory information.[5]

¶ 54    Recognizing that C.M.'s records were protected by the psychologist-patient privilege, Tarango generally alleged that C.M. had waived the privilege by placing her mental health treatment at issue and that the records might show that C.M. had identified someone other than him as her abuser. The motion theorized that he needed the records to determine whether C.M. had waived her privilege by sharing confidential information with third parties. The motion didn't allege that C.M. waived her privilege through any specific conduct or actions.

¶ 55    The court denied the request, finding that Tarango had not shown that C.M. had expressly or impliedly waived her privilege.

---

[5] Tarango also asked the court to compel C.M. to undergo a psychological examination. The court denied this request.

## B.    The Discovery

¶ 56    As best we can tell, after Tarango filed his original motion, the prosecution produced various interview transcripts to defense counsel in discovery.  Included among the discovery was a transcript of a phone conversation between Detective Peterson and C.M.'s mother.  During the call, the detective asked her about C.M.'s allegations.  In relevant part, she responded:

> I do know that when [C.M.] was at the hospital I got a phone call from one of the doctors that she had spoken with or a therapist um, and she . . . told me that [C.M.] had given permission for her to speak with me and to discuss what they talked about.  Um, and I had asked that person if [C.M.] brought up anything about the sexual abuse.  Um, and she said [C.M.] did.

¶ 57    Later in the call, C.M.'s mother described some information she found while going through C.M.'s cell phone:

> [S]o the night of the hospital, I had got ahold of [C.M.'s] roommate and I asked her roommate, I said do you know [C.M.'s] passcode? . . .  So she gave me [C.M.'s] passcode and then I opened up the phone and that's when I saw her having multiple conversations with people who I didn't even really know. . . .  [O]h, she had told some people about work.  Um, that . . . she went to, she told someone that she had already went to the hospital and that she was diagnosed with multiple personalities

26

um, depression and anxiety and that she's trying to get help.

### C.    The Motion to Reconsider

¶ 58    Tarango filed a motion to reconsider the denial of the requested mental health records, again arguing that C.M. had waived her privilege.  In support, he attached an affidavit from a defense expert and nearly one hundred pages of discovered transcripts, including the transcript of Detective Peterson's conversation with C.M.'s mother.  But the motion didn't argue that C.M. waived her privilege by authorizing her mother to speak to treatment providers or through specific text messages.  And though the motion cited a couple portions of the attached transcripts, none of the citations were to the statements C.M.'s mother made to Detective Peterson about her conversation with the provider or the text messages.

¶ 59    Many months later, Tarango filed a "motion for the court to rule" on his motion to reconsider.  Embedded within the request for a ruling, Tarango asserted for the first time that C.M. had waived her privilege by "allow[ing] her therapist to speak to her mother" and that C.M.'s mother told Detective Peterson that "she did talk to

27

C.M.'s therapist who confirmed C.M. was discussing the abuse she claims she suffered from the defendant."

¶ 60 After a hearing that addressed several outstanding motions, the court denied the motion to reconsider, finding that it "did not see any additional grounds or legal basis to support" a finding that C.M. had waived her privilege and that "C.M. is the only person who can waive" her privilege. After the court ruled, defense counsel stated:

> I tried to show additional information in my motion that the therapist had actually spoke to [C.M.'s] mother about the fact that she was talking about it in therapy while she was down there. That was an additional implied waiver. I thought because it was a third party breach, you know, sharing privileged information with a third party.

¶ 61 After some additional back and forth about whether the prosecution would open the door to C.M.'s mental health at trial, the court again stated that it "[didn't] believe that there has been a waiver of the psychotherapist-patient privilege." The text messages were never mentioned at the hearing.

### D. Applicable Law and Standard of Review

¶ 62　Colorado recognizes the psychologist-patient privilege. *See* § 13-90-107(1)(g), C.R.S. 2024. The psychologist-patient privilege assures "a victim of a sexual assault that all records of any treatment will remain confidential unless otherwise directed by the victim." *People v. Wittrein*, 221 P.3d 1076, 1083 (Colo. 2009) (quoting *People v. Sisneros*, 55 P.3d 797, 800 (Colo. 2002)). Among other things, the privilege protects treatment records from discovery and from in camera review by the court. *Id.*; *see People v. Kelley*, 2023 CO 32, ¶ 24 (discussing the analogous physician-patient privilege).

¶ 63　Because the privilege is designed to protect the patient, "the only basis" for authorizing the disclosure of privileged information is "an express or implied waiver." *Kelley*, ¶ 24 (quoting *Clark v. Dist. Ct.*, 668 P.2d 3, 9 (Colo. 1983)). "This evidentiary showing of waiver is required *before* the trial court may order the documents produced for an in camera review." *Sisneros*, 55 P.3d at 800 (emphasis added). And the party seeking the privileged information has the burden of establishing a waiver. *Kelley*, ¶ 24.

¶ 64     To determine whether a waiver occurred, "the proper inquiry is not whether the information sought may be relevant," *id.* (quoting *People v. Johnson*, 2016 CO 69, ¶ 12), but whether "the privilege holder has somehow forsaken, through words or action, a claim of confidentiality as to the information in question," *id.*

¶ 65     If preserved, we review a trial court's resolution of discovery issues, including whether to review certain documents in camera, for an abuse of discretion.  *See People v. Zapata*, 2016 COA 75M, ¶ 20, *aff'd*, 2018 CO 82.  If unpreserved, we review for plain error. *See Snelling*, ¶ 33.

¶ 66     However, whether a patient waived the psychologist-patient privilege presents a mixed question of fact and law, meaning we defer to the trial court's factual findings if supported by the record but review its legal conclusions de novo.  *See L.A.N. v. L.M.B.*, 2013 CO 6, ¶ 29; *People v. Marsh*, 396 P.3d 1, 12 (Colo. App. 2011), *aff'd*, 2017 CO 10M.

### E.     The Court Didn't Err by Refusing to Review C.M.'s Mental Health Records in Camera

¶ 67     Tarango argues that the court erred by not conducting an in camera review of C.M.'s mental health records.  He now says that

C.M. expressly or impliedly waived her privilege based on (1) the statement C.M.'s mother made to Detective Peterson that one of C.M.'s therapists "told her" that C.M. "had given permission" for the provider to speak with her, and (2) purported texts that C.M.'s mother described seeing on C.M.'s phone that C.M. apparently sent to an unknown person disclosing "her mental health diagnosis."

¶ 68    But Tarango never raised these specific arguments to the trial court in either his original motion or his motion to reconsider. Regarding preservation, Tarango simply directs us to the voluminous attachment to his motion for reconsider without explaining how attaching a hundred pages to his motion to reconsider sufficiently alerted the trial court to the specific waiver arguments he now makes on appeal.[6]  *See McFee*, ¶ 31.  Because

---

[6] While there is a brief reference to C.M.'s mother's conversation in the motion requesting a ruling on the motion to reconsider, though Tarango cites that motion, he doesn't explain how a new argument embedded in a post-reconsideration motion alerted the trial court to the specific waiver argument he now raises on appeal.  *Cf. Fox v. Alfini*, 2018 CO 94, ¶ 36 (in civil cases, "a district court generally does not abuse its discretion by refusing to consider new arguments and evidence submitted in motions to reconsider"); *People v. Genrich*, 2019 COA 132M, ¶ 156 n.2 (Tow, J., concurring in part and dissenting in part) ("[N]either the trial court nor this court is required to consider information first presented in a motion to reconsider.").

we don't see where Tarango alerted the trial court to this specific argument in his original motion or motion to reconsider, we can't say that the trial court obviously erred by not sua sponte reviewing the voluminous attachments and identifying the specific waiver arguments now presented. *See Crabtree*, ¶ 42.

¶ 69 Even if we assume the voluminous materials attached to the motion to reconsider alerted the trial court to Tarango's waiver argument, those materials include comments by C.M.'s mother and a reference to some text messages that C.M.'s mother reviewed that C.M. may have sent to unidentified persons. The materials don't include anything from C.M. showing an intent to waive her privilege. *See Kelley*, ¶ 24 (only the privilege holder can waive the privilege). Tarango doesn't explain how C.M.'s mother's statements are sufficient to waive C.M.'s psychologist-patient privilege. *Cf. Sisneros*, 55 P.3d at 802 (because the "mere threat of disclosure destroys the sanctity of the psychologist-patient relationship," courts "will not hastily find an implied waiver" when a sexual assault victim testifies in a criminal trial).

¶ 70 And we can't conclude on this record that the materials presented show that C.M. intended to waive her privilege as to her

mental health treatment.  Regarding the conversation between

C.M.'s mother and "one of the doctors . . . or a therapist" from the

hospital, C.M.'s mother only reported that the treatment provider

discussed "the sexual abuse" disclosure, not any aspects of C.M.'s

treatment or diagnosis.  Nothing shows that C.M. authorized the

provider to speak with her mother about anything other than the

disclosed sexual abuse.[7]  *Cf. id.* (sexual assault victim didn't waive

privilege by testifying at trial because she "did not reveal any

specific statements" made by her or the therapist "or any particular

diagnosis or treatment suggestions"); *People v. Silva*, 782 P.2d 846,

850 (Colo. App. 1989) (same).  Likewise, the purported texts that

C.M.'s mother described reviewing on C.M.'s phone show, at most,

that C.M. told "someone" that she was trying to "get help" for

certain mental health conditions that she was diagnosed with

during a *prior* hospitalization — not the hospitalization at issue in

this case.

---

[7] C.M. first received inpatient treatment at a hospital and then received follow-up treatment from another inpatient facility.  As best we can tell, C.M.'s mother spoke with someone from the hospital.  Again, this lack of clarity confirms that C.M. did not intend to waive her privilege.

¶ 71    Based on the record, we can't conclude that the trial court erred, plainly or otherwise, by finding that Tarango failed to show that C.M. had waived her privilege. Without that showing, the court couldn't order the production of C.M.'s records for an in camera review. Thus, the court didn't abuse its discretion by refusing to review her records.

¶ 72    Tarango alternatively requests that we remand for a compelled psychological evaluation. But Tarango doesn't argue that the court erred by denying his motion to compel C.M. to undergo a psychological examination. Because Tarango has not developed any argument challenging that ruling, we will not address the request for a remand. *See People v. Liggett*, 2021 COA 51, ¶ 53, *aff'd*, 2023 CO 22.

## V.    The Education Records

¶ 73    Tarango similarly asks us to remand to the trial court because he says the court failed to review and disclose A.A.'s education records.

## A.    Additional Background

¶ 74    Included in his motion to disclose C.M.'s mental health records, Tarango also asked the court to allow him to subpoena

34

A.A.'s "educational" records and to have the court review the records in camera for relevant or exculpatory information.

¶ 75 Concerning A.A.'s records, Tarango asserted that A.A. indicated to a forensic interviewer that she had spoken with "ladies at the school . . . about all of this" but that the forensic interviewer had not learned of the claims from A.A.'s school. Tarango didn't argue that his need for the information outweighed A.A.'s privacy interests; instead, he simply said that his offer of proof "shows A.A.'s school never contacted law enforcement about her claims"; that "it is reasonable to infer that her education records would shed light on exactly what was bothering A.A. to the potential exclusion" of Tarango; and that her educational records "would also be relevant to rebut any claims made during trial that her performance, attitude or conduct suffered because of the alleged abuse."

¶ 76 The prosecution objected, arguing that A.A.'s records were confidential, neither A.A. nor her parents had consented to releasing the records, and Tarango failed to show that his need for the records outweighed A.A.'s privacy interests.

35

¶ 77    The court denied Tarango's request to order production of A.A.'s education records for an in camera review, finding that Tarango had failed to articulate, in good faith, a specific need for her records. It noted that Tarango's proffer was "vague and conclusory" and that A.A.'s privacy interests outweighed his articulated need for her records.

¶ 78    Tarango filed a consolidated motion to reconsider the court's rulings on his request for C.M.'s treatment records and A.A.'s education records. Tarango attached an affidavit and the lengthy transcript of A.A.'s forensic interview to the motion to reconsider. In the motion to reconsider, Tarango again argued that the court should review the education records because "A.A. mentioned having already talked with the ladies at the school" who, based on an "easy inference," were school employees and mandatory reporters. Thus, he reasoned that the referenced "ladies" should have reported A.A.'s allegations to law enforcement but "no records or information has been given to the defense that reflects these prior reports." And he asserted that A.A.'s privacy interests in her educational records "is unsubstantial" compared to his interest in "having all the information relevant to his defense" and that A.A.

would "suffer no repercussions if the court were to privately review" her records "for information that is relevant and material."

¶ 79    As explained, Tarango later filed a motion for the court to rule that included more information than either his original motion or motion to reconsider. As to A.A.'s records, the motion to rule cited a portion of the forensic interview in which A.A. briefly told the interviewer that she told "Miss Dollin" that her "grandma's husband kinda touched me and my cousin really wrong."

¶ 80    After the consolidated motions hearing, the court denied the motion to reconsider, again noting that there were "too many vague and unknown quantities" such as, for example, the identity of the school employee A.A. had spoken with, whether that employee was a therapist or a counselor, and whether any privileges might apply to that employee's communications with A.A. It reiterated that Tarango had not established that his need for A.A.'s records outweighed her privacy interests "regarding behavior, discipline or academic level."[8]

---

[8] After the court ruled, defense counsel added that Tarango needed A.A.'s education records because her "intellectual disability" was relevant to the truthfulness of her allegations. Tarango does not reassert this claim on appeal.

### B. Applicable Law and Standard of Review

¶ 81 A Colorado school district "shall not release the education records of a student to any person, agency, or organization without the prior written consent of the parent or legal guardian of the student except as otherwise provided by" the Family Educational Rights and Privacy Act (FERPA). § 22-1-123(3), C.R.S. 2024; *see Wittrein*, 221 P.3d at 1085. In turn, FERPA permits the release of education records without parental consent if (1) required by judicial order or lawful subpoena and (2) the parents and student are notified in advance. 20 U.S.C. § 1232g(b)(2)(B); *see Wittrein*, 221 P.3d at 1085.

¶ 82 To obtain a court order or subpoena to access educational records, the party seeking the records "must articulate, in good faith, a specific need for the information contained in the records." *Wittrein*, 221 P.3d at 1085. The court must then balance the party's need for the information with the privacy interests of the student and the parents. *Id.* In doing so, the court should consider "(1) the nature of the information sought, (2) the relationship between this information and the issue in dispute, and (3) the harm that may result from disclosure." *Id.* (quoting *People v. Bachofer*,

38

192 P.3d 454, 641 (Colo. App. 2008)). If the court determines that the party's need outweighs any privacy interests, it should then review the records in camera. *Id.*

¶ 83    We review a trial court's decision whether to review certain documents in camera for an abuse of discretion. *Zapata,* ¶ 20.

### C.    The Court Didn't Abuse its Discretion by Refusing to Review A.A.'s Education Records

¶ 84    Tarango contends that the court erred by finding that he hadn't established a good faith, specific need for A.A.'s education records.

¶ 85    It's not entirely clear that any record of A.A.'s conversation with someone at the school about Tarango's abuse exists. But assuming such a record exists, it's also not entirely clear what Tarango claims is the good faith, specific need for A.A.'s education records. As best we can tell, Tarango argued the records might bear on the "reliability" of A.A.'s outcry; might "shed light on exactly what was bothering A.A. to the potential exclusion" of Tarango; and might be "relevant to rebut any claims made during trial that her performance, attitude or conduct suffered because of the alleged abuse." But the original motion and motion to reconsider offered

nothing more than these vague assertions. *See People v. Herrera*, 2012 COA 13, ¶ 17 (a criminal defendant's request to access confidential social services records "must be more than a mere fishing expedition"). And neither motion asserted any specific facts to suggest that A.A. ever named a person other than Tarango as her abuser. Thus, it's hard to conclude that the trial court's ruling — as framed by Tarango's original motion and motion to reconsider — was manifestly arbitrary, unreasonable, or unfair.

¶ 86 But even assuming Tarango established a good faith, specific need for the education records — which include behavior, discipline, and academic information — the court also found that Tarango's need didn't outweigh A.A.'s privacy interests in the records. Tarango doesn't explain how the court erred in this finding. *See Wittrein*, 221 P.3d at 1085 (discussing factors that a court must balance to determine whether the need for disclosure outweighs a student's and her parents' privacy interests). Rather, Tarango simply asserts that his need for the records "substantially outweigh[s]" A.A.'s privacy interests. But that bare conclusion isn't sufficient to establish that the court erred in its discretionary balancing of interests. *See People v. Lientz*, 2012 COA 118, ¶ 30

(rejecting a conclusory claim because "parties must do more than make conclusory assertions; they must present reasoned analysis").

¶ 87    Under these circumstances, we conclude the court didn't abuse its discretion by refusing to review A.A.'s education records in camera.  Thus, no remand is required.

## VI.    Disposition

¶ 88    We affirm the judgment.

JUDGE TOW and JUDGE BERGER concur.